CADDEN & FULLER LLP
Thomas H. Cadden, Bar No. 122299
Ignacio J. Lazo, Bar No. 105945
Nathaniel J. Tarvin, Bar No. 251094
114 Pacifica, Suite 450
Irvine, CA 92618
Telephone: (949) 788-0827
Facsimile:  (949) 450-0650
Emails:     tcadden@caddenfuller.com
            ilazo@caddenfuller.com
            ntarvin@caddenfuller.com

Attorneys for Plaintiff,
CENTERPOINTE CAPITAL GROUP LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| CENTERPOINTE CAPITAL GROUP LLC, a Mauritius limited life company, in its own name and on behalf of TRANSASIA INFRASTRUCTURE HOLDING LLC, a Nevada limited liability company,<br><br>             Plaintiffs,<br><br>     v.<br><br>TRANSASIA INFRASTRUCTURE HOLDING LLC, a Nevada limited liability company; TRANSTECH LLC, a Nevada limited liability company; CC INFRASTRUCTURE MANAGEMENT SOLUTIONS PRIVATE LIMITED, an Indian corporation; RAVINDRA VERMA, an individual; and DOES 1-50, inclusive,<br><br>             Defendants. | Case No. SACV08-1178 CJC (FMOx)<br><br>Assigned For All Purposes To:<br>The Honorable Cormac J. Carney<br><br>**DECLARATION OF DR. JAY VED IN SUPPORT OF PLAINTIFF CENTERPOINTE CAPITAL LLC'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR REMAND**<br><br>**Concurrently Filed:**<br>**Reply Memorandum of Points and Authorities in Support of Motion for Remand**<br><br>DATE:  December 15, 2008<br>TIME:   1:30 p.m.<br>DEPT:   9B, Hon. Cormac J. Carney<br><br>Complaint Filed:    September 4, 2008<br>Action Removed:   October 21, 2008<br>Trial Date:            Not yet set |

## DECLARATION OF DR. JAY VED

I, Dr. Jay Ved, declare that if called upon as a witness in this action, I could and would competently testify of my own personal and firsthand knowledge as follows:

1.     I am a manager of plaintiff, Centerpointe Capital Group LLC ("Plaintiff").

2.     Defendant Parsons Brinckerhoff Infrastructure Development Company, Inc. ("PBIDC") is a corporation organized under the laws of the State of New York which formerly owned one thousand Units of TransAsia. It now owns only one of those Units, but remains a member of TransAsia.

3.     In February of 2008, plaintiff acquired nine hundred and ninety-nine Units of TransAsia Infrastructure Holding LLC ("TransAsia") in February 2008 from PBIDC, pursuant to a written agreement dated as of December 21, 2007, entitled "SALE AND PURCHASE AGREEMENT (Units in TransAsia Infrastructure Holding LLC)" (hereinafter referred to as "Purchase Agreement"). A true and correct copy of the Purchase Agreement is attached to this Declaration as Exhibit A.

4.     TransAsia formerly owned 27% of Pacific Alliance-Stradec Group Infrastructure Co. LLC ("PASGIC"), a limited life company organized under the laws of the Republic of Mauritius. In turn, PASGIC owned 66.67% of Second Vivekananda Bridge Tollway Co. ("SVBTC"), an Indian company which built, owned, and operates a revenue-producing toll bridge in India.

5.     In February of 2008, concurrent with the closing of the sale of PBIDC's Units to Centerpointe, TransAsia sold 80% of its interest in PASGIC to unrelated third parties, "cashing out" the investment TransAsia's owners had made in the development of the toll bridge (the "Cash Out Sale"). In connection with the Cash Out Sale, TransAsia received more than $23 million dollars which was deposited into TransAsia's bank accounts.

6.     TransAsia and each of its previous owners, including PBIDC, had agreed that each of the owners would receive a $1.3 million repayment of project development costs ("PDC") advanced by each owner. Because TransAsia was a holding company that did not conduct any revenue-producing operations on its own, it had no source of funds other than the Cash Out Sale for reimbursing PDC. PBIDC was to receive its PDC payment when its Units in TransAsia were sold, which was to take place at the same time as the Cash Out Sale.

7.     TransAsia was included as a signatory to the Purchase Agreement between Centerpointe and PBIDC purely as a formality, to indicate that it concurred with the sale. All of the duties and responsibilities in the Purchase Agreement were between Centerpointe and PBIDC, and TransAsia signed primarily as a witness. This role was acknowledged by defendant Ravindra Verma ("Dr. Verma"), who signed the Purchase Agreement on TransAsia's behalf (at the time, he was TransAsia's manager). Attached as Exhibit B is a true and correct copy of email correspondence between me and Dr. Verma, dated January 2, 2008, in which Dr. Verma acknowledges that "TransAsia simply cosigns the SPA to ensure that the transaction goes through." ("SPA" is a reference to the Sale and Purchase Agreement, referred to in this Declaration as the Purchase Agreement.)

DECLARATION OF JAY VED

8.     In the January 2, 2008 email, Dr. Verma further acknowledges that the Purchase Agreement is to include "some language towards the PDC amount due to PBIDC."   This language was made necessary by tax considerations, which prohibited Centerpointe (referred to in the email as CCG) from paying money directly to TransAsia for the payment of PBIDC's PDC amount in connection with the purchase of its Units; accordingly, "CCG will pay the full amount to CCG [sic, he means PBIDC], while we have some language towards the PDC amount due to PBIDC."   In other words, the purchase price paid to PBIDC for its Units in TransAsia would include the amount of the PDC already due and owing to PBIDC – CCG was paying this amount directly to PBIDC, and would receive the amount in turn from TransAsia.

9.     The language that ultimately was included in the Purchase Agreement recited that:

> "The Seller [PBIDC] and the Purchaser [Centerpointe] both recognize that TransAsia has an amount payable to PBIDC of USD One Million and Three Hundred Thousand Only (USD 1,300,000) as part of the initial project development costs (**"PDC Amount"**) associated with the delivery of certain design and drawings for the SVBTC project. This amount was earlier recorded by TransAsia as an amount payable to PBIDC, as and when PBIDC's sale of sale units in the Company [TransAsia] would take place.   The parties acknowledge that the PBIDC Purchase Price is inclusive of the PDC Amount." (Purchase Agreement, Exhibit A, at ¶ 1.2; bold case in original.)

-4-

DECLARATION OF JAY VED

10.   Dr. Verma further acknowledged TransAsia's limited role in the Purchase Agreement in an email transmission to me dated August 11, 2008, in which he referenced the "Jan 2008 [sic] Share Sale Agreement between PBIDC Inc. and CCG – the same was duly endorsed by TransAsia LLC **as a witness.**" (Emphasis added.)  A true and correct copy of the August 11, 2008 email from Dr. Verma to me is attached as Exhibit C.

11.   Both of these email transmissions – one sent before the Purchase Agreement was signed, one after – make it clear that the obligation to pay PBIDC the $1.3 million PDC was entirely separate from the Purchase Agreement, and arose much earlier.  In the earlier email (Ex. B), Dr. Verma suggests the recital of the obligation as a way to ensure that Centerpointe succeeded to PBIDC's right to receive the payment, having included the amount of the payment in its purchase price.  In the later email (Ex. C), Dr. Verma refers to the $1.3 million obligation "with specific reference to the **TransAsia LL – PBIDC Inc. Agreement dated Nov. 3, 2003,** supported by PBIDC Invoices to TransAsia LLC dated August 28, 2002 and November 7, 2003." (Emphasis added.)

12.   Centerpointe succeeded to PBIDC's interests under the referenced Nov. 3, 2003 Agreement, and it is this agreement, obligating TransAsia to make a $1.3 million payment to Centerpointe as successor to PBIDC, that Centerpointe has sued to enforce.

13.   I do not presently have a copy of the prior agreement between TransAsia and PBIDC, and I have been denied access to TransAsia's books and records.  Accordingly, the Purchase Agreement was referenced in the complaint,

-5-

DECLARATION OF JAY VED

1  because it served as evidence of the prior agreement and the obligation to make the
2  $1.3 million payment.

3

4      I declare under penalty of perjury under the laws of the United States of
5  America that the foregoing is true and correct.

6

7      Executed this eighth day of December, 2008, at Anaheim, California.

8

9

10  _____

11                 DR. JAY VED

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-                    DECLARATION OF JAY VED

DECLARATION OF DR. JAY VED IN OPPOSITION TO MOTIONS TO COMPEL

ARBITRATION FILED BY DEFENDANTS TRANSASIA, TRANSTECH AND DR. VERMA

EXHIBIT A

## SALE AND PURCHASE AGREEMENT
### (Units in TransAsia Infrastructure Holding LLC)

This Agreement ("Agreement") is made this 21st day ▓▓December 2007

Between

PARSONS BRINCKERHOFF INFRASTRUCTURE DEVELOPMENT COMPANY, INC. a company incorporated in United States and having its office at One Penn Plaza, New York, NY 11019 (hereinafter referred to as " Seller" or "PBIDC" which expression shall, unless repugnant to the subject, context or meaning thereof, be deemed to mean and include its successors, administrators and permitted assigns) of the one part;

And

CENTERPOINTE CAPITAL GROUP LLC, a company incorporated in Mauritius, and having its principal address at IFS Court, Twenty Eight, Cybercity, Ebene, Mauritius (hereinafter referred to as "Purchaser" which expression shall, unless repugnant to the subject, context or meaning thereof, be deemed to mean and include its successors and assigns) of the second part.

And

TRANSASIA INFRASTRUCTURE HOLDING LLC, a limited liability company constituted under the laws of the State of Nevada, U.S.A, with its principal office at 2 Almeria, Irvine CA 92614, USA (hereinafter referred to as "TransAsia" or "Company", which expression shall, unless repugnant to or inconsistent with the context or meaning thereof, be deemed to mean and include its successors and permitted assigns); of the third part.

The Seller, the Purchaser and TransAsia are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties".

WHEREAS:

A.   TransAsia, is a shareholder of PASGIC (defined hereinafter). PASGIC is a shareholder of SVBTC (defined hereinafter). TransAsia has an issued capital of United States Dollar USD Three Thousand only divided into Three Thousand units of United States Dollar one each.

B.   The Seller is the sole legal and beneficial owner of 1000 (One Thousand) units of the Company representing thirty three point three three (33.33%) of the total issued equity capital of the Company, and the Seller is registered as the shareholder in the records of the Company, in respect of the said ordinary equity units referred to in this Recital B.

Exhibit _A_

000   7

C.    As on Signature Date, the Purchaser is a shareholder of Pacific Alliance Development Inc., (PADI), and through its subsidiary Pacific Alliance International,LLC, PADI is one of the registered shareholders of PASGIC.

D.    The Purchaser desires to purchase and the Seller desires to sell 999 units in the Company of USD 1 (United States Dollars one) each, representing 33.30% of the issued and paid up capital of the Company ("Sale Units") held by the Seller, upon the terms and conditions hereinafter appearing.

NOW THE PARTIES HEREBY AGREE as follows:

1.    AGREEMENT TO SELL AND PURCHASE

1.1    Subject to the terms and conditions of this Agreement, the Purchaser shall purchase and the Seller shall sell and transfer the Sale Units together with all rights attaching thereto, free and clear of all Encumbrances. The Seller represents that the Sale Units offered for sale represent 33.30% (thirty three point three zero per cent) of the issued and paid up capital of the Company.

The total consideration for the sale of Sale Units is United States Dollars Five Million Six Hundred Eighty-Three Thousand and Two Hundred and Ninety Only (US $5,683,290.00) only (hereinafter referred to as the "PBIDC Purchase Price")

1.2    The Seller and the Purchaser both recognize and accept that TransAsia has an amount payable to PBIDC of USD One Million and Three Hundred Thousand Only (USD 1,300,000) as part of the initial project development costs ("PDC Amount") associated with the delivery of certain design and drawings for the SVBTC project. This amount was earlier recorded by TransAsia as an amount payable to PBIDC, as and when PBIDC's sale of sale units in the Company would take place. The Parties acknowledge that the PBIDC Purchase Price is inclusive of the PDC Amount.

2.    CONDITIONS PRECEDENT

2.1    The obligation of the Purchaser to release the PBIDC Purchase Price under Clause 1.1 above, is subject to *inter alia*, the fulfillment of the following conditions and delivery and execution of the following items ("Conditions Precedent") in a form and manner acceptable to the Purchaser (such acceptance not to unreasonably be withheld or delayed), provided that Purchaser may at its sole discretion, waive or defer compliance with any of the Conditions Precedent in writing, and/or attach to such waiver or deferral such conditions as Purchaser may deem fit:

(a)    No event shall have occurred or be continuing, which, in the Purchasers reasonable opinion, constitutes, or may, with the passage of time, giving of notice or otherwise, constitute a Material Adverse Effect;

Exhibit ___A___

(b)   Receipt of by the Purchaser of (i) a release letter substantially in the form set out in Annexure B(i), evidencing release of all claims, present and future, against SVBTC and PASGIC by the Seller, on behalf of itself and the Seller's parent company, all its affiliates and members of the Parsons Brinckerhoff Inc. group; and (ii) an undertaking, substantially in the form set out in Annexure B(ii), from the Seller;

(c)   The Sellers shall have delivered to the Purchaser:

(i)   certified true copies of all necessary authorizations of the Seller including resolutions of its board of directors, approving the execution, delivery and performance of this Agreement, the Termination Agreement, the Voting and Call Option Agreement and the termination agreement referred to in Clause 2.1(c)(iv) hereof;

(ii)   Letter of resignation of Mr. Steve Losi, a Manager of the Company, nominated by the Seller, effective as of Signature Date, relinquishing the office of Manager of the Company or any other office or employment or contract with the Company. Such letters of resignation shall contain a confirmation that the aforesaid Manager has no claims against the Company for compensation for loss of office or termination of employment, whether statutory or otherwise; or for unpaid remuneration.

(iii)   a duly executed termination agreement, substantially in the form annexed as Annexure C ("Termination Agreement"), terminating the Shareholders Agreement, dated March 31, 2004 between TransAsia, PBDIC, Consulting Engineering Services (India) Private Limited and Carter Burgess Phils Inc., effective on and from the Signature Date, in such numbers of counter parts as may be agreed to between the Parties;

(iv),   termination agreement duly executed by the Seller, substantially in the form annexed as Annexure D, terminating the Operating Agreement of the Company, dated October 17, 2001 (as amended from time to time), effective on and from the Signature Date, in such numbers of counter parts as may be agreed to between the Parties;

(v)   such further instruments and documents as may be necessary under applicable Law or reasonably required by the Purchaser, for consummation of the transactions contemplated herein.

2.2   Unless otherwise agreed by the Parties in writing, the Conditions Precedent shall be satisfied no later than One (1) Business Day prior to the Closing Date (the "Cut-Off Date"). If, at any time, the Seller becomes aware of a fact or circumstance that might prevent a Condition Precedent from being satisfied

Exhibit ___A___

2

000 3

prior to the Cut-Off Date, it shall, immediately inform the Purchaser of the same in writing.

2.3 If any of the Conditions Precedent has not been fulfilled to the reasonable satisfaction of the Purchaser, or waived in writing by the Purchaser on or prior to the Cut Off Date, the Purchaser may (in its discretion) and without prejudice to its rights hereunder and under applicable Law, terminate this Agreement by giving a notice in writing to the Seller. Upon such termination, no Party shall have any rights or claims against the other, except any rights of any Party in respect of a material breach of this Agreement prior to such termination.

2.4 Immediately upon fulfillment of all the Conditions Precedent, the Seller shall certify the fulfillment of the same to the Purchaser in a form mutually agreed between the Parties ("Closing Certificate"). The Closing Certificate shall be accompanied with documentary evidence, evidencing the fulfillment of the Conditions Precedent.

3. CLOSING

3.1 Closing shall take place on the date mutually agreed between the Parties in writing, which shall (unless otherwise agreed by the Parties in writing), in no event be later than One (1) Business Day after the Conditions Precedent have been satisfied ("Closing Date"), at the offices of TRANSASIA or such other address as the Parties may agree in writing.

3.2 On the Closing Date, the Parties shall cause the following to occur, to the extent practicable, simultaneously:

3.2.1 the Seller shall deliver to the Purchaser (i) duly executed, valid and registrable transfer documents of all the Sale Units in favour of the Purchaser sufficient to vest good and valid legal and beneficial title to the Sale Units in the Purchaser, effective as of Signature Date, under applicable Law; and (ii) the original certificates evidencing the Sale Units; and (iii) counterpart of a voting agreement, non-disposal undertaking and a call option agreement, substantially in the form annexed as Annexure E ("Voting and Call Option Agreement") in relation to the Retained Shares, duly executed by it.

3.2.2 the Seller shall deliver to the Purchaser a counterpart of the resolution of Managers of the Company, substantially in the form set out at Annexure F, duly executed by the Manager (nominated by the Seller):

(a) recording the transfer of all the Sale Units from the Seller to the Purchaser effective from Signature Date and directing that, upon registration of the share transfer forms with the relevant authorities, the said transfer of the Sale Units be immediately entered in the members' register of the Company; and

3

Exhibit _____A_____

000 10

(b)    the appointment of the nominee of the Purchaser a Manager of the Company with effect from Signature Date;

3.2.3    The Company shall, and the Seller and the Purchaser shall cause the Company to deliver certified true copies of the resolutions of the Managers:

(a)    approving the execution, delivery and performance of this Agreement, the Termination Agreement, the Voting And Call Option Agreement and the termination agreement referred to in Clause 2.1(c)(iv) hereof; and

(b).    approving the acceptance and recording of the acceptance of the letters of resignation of nominee of Seller as the Manager of the Company.

3.2.4    The Company shall, and the Seller and the Purchaser shall cause the Company to deliver to the Purchaser a copy of the share transfer register of the Company after recording the sale and purchase of the Sale Units in accordance with this Agreement certified by a director of the Company to be true, complete and correct.

3.3    Within one (1) day following the Closing Date, the Purchaser shall issue irrevocable payment instructions to the Purchaser's bank (with a copy to the Seller), instructing the bank to remit and pay the PBIDC Purchase Price to the following bank account designated by the Seller:

JPMorgan Chase Bank

ABA 021000021

Account No. 035 131 4802

Parsons Brinckerhoff Inc.

[Reference line : PBIDC Proceeds]

The Purchaser shall ensure that the PBIDC Purchase Price is then promptly remitted and paid into the Seller's aforesaid designated bank account in accordance with such payment instructions.

3.4    The Parties agree that unless all conditions referred to in clauses 3.2 and 3.3 have been satisfied or as the case may be, obligations performed, (to the extent not waived), Closing shall deemed to have not occurred.

3.5 Pursuant to the sale and purchase of the Sale Units as contemplated hereunder, the holding of the Company shall be as follows:

| Unit Holder | Number of Units | Effective Holding Percentage |
|---|---|---|
| Seller | 1 | 0.03% |
| Purchaser | 999 | 33.30% |
| Others | 2000 | 66.67% |
| Total | 3000 | 100% |

3.6 The Seller, TransAsia and the Purchaser shall take or cause the Company to take, all steps as may be required to ensure that all actions required to consummate the transaction contained in this Agreement are complied with including but not limited to the requisite filings and registrations required by applicable Law.

3B **Post Closing Actions**

As soon as practicable after Closing, the Seller shall deliver to the Purchaser such records, correspondence, documents, files, memoranda and other papers relating to the Company, PASGIC or SVBTC which are in its possession and as may be reasonably required by the Purchaser and communicated to the Seller in writing.

4. **REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS**

4.1 The Seller hereby represents, warrants and undertakes to the Purchaser that the following representations and warranties are true and correct in all respects as of the Signature Date and on Closing Date:

(a) The Seller is duly incorporated and validly existing and in good standing under the laws of United States with full power to carry out its business as now conducted by it.

(b) The Seller has the authority to execute, deliver and perform this Agreement and the transactions contemplated herein. The execution, delivery and performance by the Seller of this Agreement have been duly authorized and approved by necessary corporate actions.

(c) This Agreement is valid and legally binding upon the Seller and enforceable against it in accordance with its terms and neither the execution of this Agreement by the Seller nor the performance by it of the various terms and provisions hereof will violate the Charter Documents, applicable Law or any deed or agreement to which it is party or by which it is bound.

(d) The Seller is not restricted by any judgment, injunction, order, decree



or award from the execution, delivery and performance of this Agreement and all the instruments and agreements required to be executed by the Seller hereunder.

(e)   The Seller has on Signature Date and will continue to have, until transfer of the Sale Units to the Purchaser (as contemplated hereunder), good and marketable title to the Sale Units, free and clear of any and all liens, Encumbrances, equities, and claims whatsoever, with full right and authority to deliver the same under this Agreement, and upon delivery of the Sale Units as contemplated in this Agreement and subject to Clause 3.4, will convey to the Purchaser good and marketable title to such Sale Units free and clear of all liens, claims, Encumbrances, equities, pre emptive rights, rights of first refusal, and any other claim of any third party.

(f)   The Seller agrees and acknowledges that the Purchaser is entering into this Agreement strictly in reliance of the Warranties.

(g)   The Sale Units represent 33.30% of the issued and paid up capital of TransAsia.

## 4A.   COVENANTS PENDING CLOSING

4A.1   The Seller shall immediately cease any and all existing activities, discussions or negotiations with any party(ies) conducted prior to the execution of this Agreement, with respect to clauses (a) to (d) immediately below. Until the earlier of (i) the Closing or (ii) the date of termination of this Agreement pursuant to the provisions hereof, the Seller shall not (nor shall they permit any of their respective officers, directors, agents, advisors, representatives to), directly or indirectly, take any of the following actions with any Person other than the Purchaser and its designees:

(a) ,   solicit, encourage, entertain, initiate or participate in any inquiry, negotiations or discussions or enter into any agreement with respect to any offer or proposal to, acquire any Units, capital stock (or securities convertible into or exercisable for such Units) of TRANSASIA held by PBIDC, including the Sale Units (each of the foregoing, an "Acquisition Proposal");

(b)   disclose any information not customarily disclosed to such Person concerning the business, technologies, or properties, or afford access to the properties, technologies, books or records of TRANSASIA or PASGIC or SVBTC to any person not customarily afforded such access;

(c)   assist or cooperate with any person to make any Acquisition Proposal; or

6

(d) solicit, negotiate or enter into any agreement with any person with respect to an Acquisition Proposal.

4A.2 During the period commencing from the Signature Date and Closing Date, the Seller shall, give prompt notice to Purchaser of (a) the occurrence or failure to occur, of any event that to the Seller's best knowledge, could cause any representations or warranties of the Seller to be untrue or inaccurate at any time, and (b) any failure of the Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. The Parties agree that the Purchaser's right to information contained in this Clause 4A.2 shall be without prejudice to any other rights and remedies of the Purchaser under this Agreement or otherwise.

## 4B. INDEMNIFICATION BY THE SELLER

4B.1 The Purchaser will be entitled to rely upon the Sellers' representations and warranties set forth in any certificate, schedule or exhibit delivered pursuant hereto. Each of the Purchaser Indemnified Person (as defined hereinafter) may bring a Relevant Claim for indemnification for Damages (as defined hereinafter) under this Clause 4B. The obligations of the Seller with respect to the Warranties will survive the Closing and continue in full force and effect in accordance with Schedule 1.

The Seller will indemnify and hold harmless the Purchaser, its officers, directors, agents, attorneys, affiliates and employees (hereinafter referred to individually as a "**Purchaser Indemnified Person**" and collectively as the "**Purchaser Indemnified Persons**") from and against any and all actual losses, damages, fines, fees, penalties, interest obligations, and expenses (including amounts paid in court costs, reasonable out-of-pocket fees and expenses of, attorneys) incurred or suffered by the Purchaser Indemnified Persons ("**Damages**") directly as a result of any misrepresentation or breach or inaccuracy of or default in connection with any of the Warranties, covenants and obligations of the Seller in this Agreement.

4B.2 Notwithstanding anything to the contrary contained in this Agreement, the Seller's liability under this Clause shall be only for Relevant Claim(s) and be limited or excluded, as the case may be, in accordance with the provisions of Schedule 1.

4B.3 The indemnification provisions of this Clause 4B shall be the sole and exclusive remedy of the Purchaser with respect to claims arising under this Agreement.

## 5. DEFAULT AND TERMINATION

5.1 This Agreement shall take effect from the Signature Date and shall continue in force unless terminated in accordance with the provisions set out herein.

Exhibit ___A___

7

000 14

5.2     This Agreement maybe terminated prior to Closing as follows:

   (a)     Upon the mutual written agreement of the Parties;

   (b)     At the election of the Purchaser, if the Seller has breached any Warranties, and/or failed to perform any other covenant or agreement contained in this Agreement;

   (c)     At the election of the Seller, in case the Purchaser failed to perform any covenant and/or agreement contained in this Agreement;

   (d)     This Agreement may be terminated by the Purchaser as contemplated in Clause 2.3 hereof.

5.3     If this Agreement is terminated in accordance with this Clause 5, it shall be of no further force and effect, except for the provisions of Clause 4 (Representations, Warranties and Undertakings), Clause 14 (Governing Law), Clause 6 (Notice), Clause 4B (Indemnification by the Seller), Clause 9 (Invalidity); Clause 13 (Confidentiality) and Clause 15 (Dispute Resolution), Clause 7 (Assignment), Schedule 1 and other representations, warranties, covenants and provisions contained herein that by their nature are intended to survive such termination; provided, however, that such termination shall, unless otherwise agreed in writing by the Parties, be without prejudice to the rights of any Party in respect of a material breach of this Agreement prior to such termination.

6.     NOTICE

6.1     All notices, demands or other communications required or permitted to be given or made hereunder shall be in writing and delivered personally or sent by prepaid registered post or by telex or facsimile transmission addressed to the intended recipient thereof at its address set out herein below:

   (a)     To the Seller, at the addresses and facsimile number:

           Address:     Parsons   Brinckerhoff   Infrastructure   Development Company, Inc.
                        One Penn Plaza
                        New York, NY 11019

           Telephone:   212-465-5000

           Attn:        Mr. Bruce Johnke, Director

           Facsimile:   212-465-5096.

   (b)     To the Purchasers, at the following addresses and facsimile number:

Exhibit A

Address:    Centrepointe Capital Group LLC
c/o: IFS Court
Twenty Eight, Cybercity, Ebene, Mauritius

Telephone:   (230) 467 3000

Attn:     Dr. Jay Ved, Director

Facsimile :   (230) 467 4000

(c)    To TransAsia, at the address and facsimile number:

Address:    2, Almeria, Irvine, CA 92614

Telephone:   949-514-4124

Attn:     Dr. Ravindra Verma, Managing Director & CEO

Facsimile :  949-553-1238

or to such other address, telex number or facsimile number as any party may from time to time notify the others. Any such notice, demand or communications shall be deemed to have been duly served immediately (if given or made by telex or facsimile transmission evidenced by the relevant transmission reports/ receipts); or (if given or made by letter ) seven Business Day(s) after posting and in proving the sending of the original telefax transmission by prepaid post or the postage of the letter it shall be sufficient to show that the envelope containing the same was duly addressed, stamped and posted.

7.    ASSIGNMENT

Neither Party hereto may assign or otherwise transfer any of their rights under this Agreement without the prior written consent of the other.

8.    TIME

Time wherever mentioned shall be of the essence of this Agreement.

9.    INVALIDITY

If any term or provision in this Agreement shall be held to be illegal or unenforceable in whole or in part, under applicable Law, such term or provision or part shall to that extent be deemed not to form part of this Agreement but the enforceability of the remainder of this Agreement shall not be affected. If for any reason whatsoever any provision of this Agreement is or becomes, or is declared by court of competent jurisdiction to be, invalid,

illegal or unenforceable, then the Parties will negotiate in good faith to agree
on one or more provisions to be substituted therefore which provisions shall,
as nearly as practicable, leave the Parties in the same or nearly similar position
to that which prevailed prior to such invalidity, illegality or unenforceability.

10.    COUNTERPARTS

This Agreement may be entered into in any number of counterparts and by the
Parties to it on separate counterparts, each of which when so executed and
delivered shall be an original, but all the counterpart shall together constitute
one and the same instrument. This Agreement may be executed by delivery of
the signature page hereof by facsimile transmission.

11.    COSTS

Each Party shall bear its own legal fees, costs and expenses relating to the
preparation and execution of this Agreement. The stamp duty payable on the
Transfer(s) of the Sale Units and this Agreement shall be paid by the
Purchaser.

12.    SUCCESSORS BOUND

This Agreement shall be binding upon the heirs, executors, successors-in-title,
and permitted assigns of the Parties hereto.

13.    CONFIDENTIALITY

Each of the Parties hereto undertakes to each other that both during the term of
this Agreement and thereafter, neither it nor its subsidiaries or affiliates will
use or disclose, and it shall procure (so far as it lies reasonably within its
power so to procure) that its holding companies, associated companies, agents,
directors, officers and contractors will not use or disclose to any person the
contents of this Agreement, the negotiations relating to this Agreement,
documents executed pursuant hereto or any confidential information
concerning the business and affairs of the other party which may come to the
knowledge of such Party and shall prevent the use or disclosure of any such
information. For the avoidance of doubt this obligation on the Parties shall
survive the termination of this Agreement in whatever manner and shall
continue whether any Party shall cease to be a Party hereto or a shareholder in
the Company or otherwise. The obligations of confidentiality do not extend to
information which:

Exhibit A

10

000 17

(a) is disclosed to employees, legal advisers, auditors and other consultants of a Party provided such persons undertake similar confidentiality obligations to those set forth herein;

(b) is required to be disclosed pursuant to applicable Law or the rules of any relevant stock exchange or is appropriate in connection with any necessary or desirable intimation to the Government or any regulatory authority;

(c) Any information which is or comes into the public domain other than through breach by such Party of this Clause;

(d) is required to be disclosed pursuant to judicial or regulatory process or in connection with any judicial process regarding any legal action, suit or proceeding arising out of or relating to this Agreement, after giving prior notice to the other Party.

Notwithstanding anything to the contrary contained herein, on and from the transfer and sale of the Sale Units by the Seller to the Purchaser, all information pertaining to the Company, PASGIC and SVBTC shall be deemed to be confidential information of the Purchaser (but excluding any information which is or comes into the public domain other than through breach by the Seller of this Clause) and none of the obligations of confidentiality contained herein shall apply to the Purchaser in so far as such information relates to the Company, PASGIC and SVBTC and/or their respective businesses.

14.     GOVERNING LAW

This Agreement shall be governed and construed in accordance with the laws of United States and subject to the provisions of Clause 15A (*Dispute Resolution*), be subject to the exclusive jurisdiction of the courts of United States.

15     DISPUTE RESOLUTION

15.1     All disputes, differences, controversies and questions directly or indirectly arising at any time under, out of, in connection with or in relation to this Agreement (or the subject matter of this Agreement) including, without limitation, all disputes, differences, controversies and questions relating to the validity, interpretation, construction, performance and enforcement of any provision of this Agreement shall be finally, exclusively and conclusively settled by reference to arbitration under the rules of Singapore International Arbitration Centre ("SIAC") and to be administered by the arbitral tribunal by reference to three arbitrators, one arbitrator to be appointed by the Purchaser, one to be appointed by the Seller and the third to be appointed by the two appointed arbitrators, before commencement of the arbitration. If either Party fail to nominate an arbitrator within 30 days of receiving written notice of a

11

UUU 18

request for arbitration and the nomination of an arbitrator by the other Party, such arbitrator shall at the request of that Party be appointed by Singapore International Arbitration Centre ("SIAC"). If the two arbitrators to be nominated by the Parties fail to agree upon a third arbitrator within 30 days of the appointment of the second arbitrator, the third arbitrator shall be appointed on the nomination of the SIAC at the written request of either Party.

15.2   The Parties agree:

(a)   to be bound by any arbitral award or order resulting from any arbitration conducted hereunder;

(b)   not to commence, procure, participate in, or otherwise be involved in any action or proceeding that might result in any judgement, injunction, order or decision of any court concerning a dispute, controversy or question save and except for obtaining any judgement or order recognising or enforcing an arbitral award or order made in such arbitration; and

(c)   any judgement on any arbitral award or order in an arbitration held pursuant to this Clause 15 may be entered in any court having jurisdiction in relation thereto or having jurisdiction over any of the Parties or any of their assets.

15.3   All proceedings in any such arbitration shall be conducted in English.

15.4   The arbitration award shall be final and binding on the parties, and the parties agree to be bound thereby and to act accordingly.

15.5   The arbitration shall take place in Singapore.

15.6   During the course of arbitration, this Agreement shall continue to be performed in all respects except for the disputed part referred to arbitration.

16.   **FURTHER ASSURANCE**

At any time after the Signature Date each Party shall (and shall use its best endeavours to procure that any necessary third party shall) execute such documents and do such acts and things as the other Party may reasonably require for the purpose of giving to the other Party the full benefit of all the provisions of this Agreement.

17.   **INTERPRETATION**

17.1   Any reference to a statutory provision shall include any subordinate legislation made from time to time under that provision.

17.2   Any reference to a statutory provision shall include that provision as from time to time modified or re-enacted whether before or after the date of this

Exhibit A

12

000 13

Agreement so far as such modification or re-enactment applies or is capable of applying to any transactions entered into prior to Closing and (so far as liability thereunder may exist or can arise) shall include also any past statutory provision (as from time to time modified or re-enacted) which such provision has directly or indirectly replaced.

17.3    A day shall mean any day between Monday and Friday which is not a public holiday in the United States and a month shall mean a period calculated from any specific day up to and including the day immediately corresponding to that specific day in the subsequent month or if there shall be no such day in such subsequent month, the last day of that month.

17.4    The clause and sub-clause heading are for ease of reference only and shall not be taken into account in the construction or interpretation of the clause or sub-clause to which they refer.

17.5    Words importing the singular meaning where the context so admits include the plural meaning and vice versa.

17.6    Words of the masculine gender including the feminine and neuter gender and words denoting natural person include corporations and firms and all such words shall be construed interchangeably in that manner.

17.7    In addition to terms defined elsewhere in this Agreement, the definitions and other provisions in Annexure A headed "Definitions" apply throughout this Agreement, unless the contrary intention appears.

17.8    Any word or phrase defined in the body of this Agreement as opposed to being defined in Annexure A shall have the meaning assigned to it in such definition throughout this Agreement, unless the contrary is expressly stated or the contrary clearly appears from the context.

17.9    If any provision in Annexure A is a substantive provision conferring rights or imposing obligations on any Party, effect shall be given to it as if it were a substantive provision in the body of this Agreement.

18.    ENTIRE AGREEMENT AND MODIFICATIONS

18.1    This Agreement embodies all the terms and conditions agreed upon between the Parties hereto as to the subject matter of this Agreement and supersedes and cancels in all respect all previous agreements and undertakings, between the Parties hereto with respect to the subject matter hereof whether such be written or oral.

18.2    This Agreement shall not be altered, changed, supplemented or amended except as mutually agreed and by written instruments signed by the Parties hereto.

000 20

WITNESS WHEREOF the Seller, the Purchaser, and TransAsia have hereunto set their respective hands the day and year first above written.

Signed by                                              )
                                                       )
Passport/IC No.   N / A                                )
For and on behalf of                                   )

PARSONS   BRINCKERHOFF   INFRASTRUCTURE   DEVELOPMENT COMPANY, INC.

                                                       )

in the presence of:

Witness
Name:  Hillary Jassey
Passport/IC No.:   N / A

Signed by                                              )
                                                       )
Passport/IC No.                                        )
For and on behalf of                                   )
Centerpointe Capital Group

in the presence of:                                    )

Witness
Name:  R AV INDIA  V ERMA
Passport/IC No.:     N / A

Signed by                                              )
                                                       )
Passport/IC No.                                        )
For and on behalf of                                   )
TransAsia Infrastructure Holding LLC LLC               )
in the presence of:                                    )

Witness
Name:  SANDEEP LAKHANPAL
Passport/IC No.:

14

WITNESS WHEREOF, the Seller, the Purchaser, and TransAsia have hereunto set their respective hands the day and year first above written.

Signed by _____ )
                                )
Passport/IC No.  N/A    )
For and on behalf of        )

**PARSONS BRINCKERHOFF INFRASTRUCTURE DEVELOPMENT COMPANY, INC.**

                                  )

in the presence of:

Witness
Name: Hillary Jassey
Passport/IC No.:

Signed by _____ )
                                  )
Passport/IC No.  N/A    )
For and on behalf of        )
**Centerpointe Capital Group**

in the presence of:              )

Witness
Name:  RAVINDRA VERMA
Passport/IC No.:  N/A

Signed by                    )
                                  )
Passport/IC No.               )
For and on behalf of        )
**TransAsia Infrastructure Holding LLC LLC**
in the presence of:            )

Witness
Name:  SANDEEP LAKHANPAL
Passport/IC No.:  N/A

EXHIBIT A

14

## SCHEDULE 1
## LIMITATIONS ON INDEMNITY

Notwithstanding anything contained in this Agreement, the obligations of the Seller pursuant to Clause 4B (*Indemnity*) shall be subject to the following conditions:

1.1     The Seller is not liable in respect of a Relevant Claim:

         1.1.1    unless the amount that would otherwise be recoverable from the Seller (but for this paragraph 1.1.1) in respect of that single Relevant Claim (excluding interest, costs and penalties in respect of a Relevant Claim arising after the date of the Relevant Claim) exceeds USD 50,000; and

         1.1.2    unless and until the aggregate amount that would otherwise be recoverable from the Seller (but for this paragraph 1.1.2) in respect of that Relevant Claim (excluding interest, costs and penalties in respect of a Relevant Claim arising after the date of the Relevant Claim), when aggregated with any other amount or amounts (excluding interest, costs and penalties in respect of a Relevant Claim arising after the date of the Relevant Claim) recoverable in respect of other Relevant Claims, exceeds USD 100,000 and, in the event that such aggregated amounts exceed such amount, the Seller shall (subject to paragraphs 1.2 and 1.3 below) be liable for the full amount of the Relevant Claims.

1.2     Notwithstanding anything to the contrary contained herein but without prejudice to Clause 6 of this Schedule 1, the total liability of the Seller in respect of all Relevant Claims shall not exceed USD Five Million (USD 5,000,000.00).

1.3     The Purchaser shall not be entitled to claim or recover for any Consequential Losses in respect of any Relevant Claim.

## 2     TIME LIMITS FOR BRINGING CLAIMS

The Seller shall not be liable for any Relevant Claim, unless the Purchaser has notified the Seller of such Relevant Claim, in writing, stating in reasonable detail the nature of such Relevant Claim and the amount claimed (detailing the Purchaser's calculation of the loss thereby alleged to have been suffered) on or before the date which is 12 months from Closing except in case of a Relevant Claim with respect to breach or misrepresentation of Warranty represented under sub Clause 4.1(e) of the Agreement, in which case the statutory period of limitation under applicable Law shall apply.

## 3     SPECIFIC LIMITATIONS

The Seller shall not be liable in respect of a Relevant Claim to the extent that:

3.1     the matter giving rise to such Claim would not have arisen but for:

3.1.1   an act or omission ("Event") after Closing by the Purchaser, other than an Event occurring pursuant to a legally binding obligation of the Seller which was in force before Closing;

3.1.2   the passing of, or a change in, a law, rule, regulation, directive or requirement, interpretation of the law or administrative practice of a government, governmental department, agency, regulatory body, or Tax authority on or after the date of this Agreement or an increase in the Tax rates or an imposition of Tax, in each case, not actually or prospectively in force at the date of this Agreement;

3.1.3   a change in the accounting policies or practices of the Company after Closing, other than one required to comply with generally accepted accounting principles and practices in force as at the date of this Agreement in the relevant jurisdiction of incorporation of the Company;

4   **RECOVERY**

Where the damage or loss to the Purchaser due to the breach of more than one Warranty the Purchaser is not entitled to recover such damage or loss more than once.

5   **MITIGATION**

Nothing in this Schedule restricts or limits any general obligation at law on the Parties to mitigate any Damages which may be incurred or suffered in consequence of a matter giving rise to a Relevant Claim.

6   **GENERAL**

Nothing in this Agreement (including this Schedule 1) shall have the effect of limiting or restricting any liability of the Seller in respect of a Claim arising as a result of any fraud committed by the Seller.

Exhibit A

16

000 24

ANNEXURE A

## DEFINITIONS

In this Agreement, unless repugnant to the meaning or context thereof the following expressions bear the following meanings:

"Agreement" means this Agreement along with the Annexures, Schedules and Exhibits attached to it or incorporated in it by reference and also includes all subsequent amendments and modifications to this Agreement, if any.

"Business Day" means a day, not being a Saturday or a Sunday or any other banking holiday, on which banks are open for business (including for dealings in foreign currency, deposits and exchange) in State of Nevada, United States and in the context of a payment being made to or from a bank in a place other than State of Nevada, United States, in such other place;

"Charter Documents" shall mean, as applicable, all organizational documents of a company (including, without limitation, articles of incorporation, articles of organization, bylaws and operating agreements), in each case as amended;

"Closing" means the consummation of the transaction contemplated in this Agreement in accordance with Clause 3 of this Agreement;

"Consequential Losses" means any punitive or exemplary damages, any indirect or consequential damages or any loss of profit or revenue or damage to goodwill or reputation, in each case, whether due to a breach of contract, a breach of warranty, negligence or otherwise;

"Encumbrance" shall mean (i) any mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, deed of trust, title retention, security interest, claim, equities or equitable right or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including without limitation any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable Law, (ii) in relation to the shares or units, any proxy or power of attorney to create an Encumbrance, voting trust agreement, interest, option, right to acquire, right of pre-emption or right of first refusal or offer in favour of any Person, (iii) any adverse claim as to title, possession or use, (iv) any other claim of any third party, and (v) any agreement to create any of the above;

"Law" shall mean any statute, law, regulation, ordinance, rule, judgement, order, decree, by-law, clearance, directive, guideline, policy, requirement, or any governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration having the force of law of any of the foregoing, by any Governmental Authority having jurisdiction over the matter in question, whether in effect as of the date of this Agreement or thereafter;

17

000 25

"Material Adverse Effect" means any material impairment of the ability of any Party to perform its obligations hereunder or a material adverse effect on the validity or enforceability of this Agreement, or on the rights or remedies of the Purchaser;

"PASGIC" shall mean Pacific Alliance Stradec Group Infrastructure Company;

"Person" shall mean any individual, firm, company, joint venture, association, partnership, trust, unincorporated organisation or other entity (whether having separate legal personality and identity or not) including a Governmental Authority;

"Relevant Claim" means any claim exceeding USD Fifty Thousand (USD 50,000) made by the Purchaser under, pursuant to or for breach of Warranty and/or Clause 4B , or any other claim by the Purchase under or in respect of this Agreement or the transactions contemplated thereby;

"Retained Shares" shall mean 1 unit of TransAsia, representing 0.03% of the issued and paid up capital of TransAsia, to be retained by the Seller on and from Closing;

"Signature Date" means the date of this Agreement written hereinabove;

"SVBTC" means Second Vivekananda Bridge Tollway Company Private Limited;

"Tax" or collectively "Taxes" shall mean (i) any and all taxes, assessments and other governmental charges, duties, impositions and liabilities imposed by any governmental body competent to impose such Tax, including, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, employment, excise, windfall, gross receipts, severance and property taxes, together with all interest, penalties and additions imposed with respect to such amounts;

"Warranty" or "Warranties" shall mean the representations, warranties and undertakings and covenants as set out in Clauses 4 and 4A hereof.

18

ANNEXURE B (i)
Format of Release Letter

*[To be issued on the letterhead of Parsons Brinckerhoff Infrastructure Development
Company, Inc.]*

Date: December 21, 2007

To

    1.  Pacific Alliance-Stradec Group Infrastructure Company LLC
    Attn: Dr. Jay Ved, Chairman

    2.  Pacific Alliance International LLC
    Attn: Dr. Jay Ved, Director

    3.  TransAsia Infrastructure Holding LLC
    Attn: Dr. Ravindra Verma, Vice-Chairman & Managing Director

Dear Sirs

## RELEASE OF ALL CLAIMS

We the undersigned, on our own behalf and on behalf of our parent company Parsons Brinckerhoff Inc, and all affiliates and other members of the Parsons Brinckerhoff Inc. group, Inc hereby irrevocably and unconditionally remise, release, acquit, waive, relinquish, withdraw, undertake not to initiate, proceed with or prosecute and forever discharge each of Pacific Alliance-Stradec Group Infrastructure Company LLC and Second Vivekananda Bridge Tollway Company Pvt. Ltd. ("Release"), with effect from the date of this letter, in connection with all claims, liabilities, obligations, demands, show cause notices, charges, complaints, objections, sums of money, law suits, costs, judgments, attorney's fees, actions and causes of actions, suits, rights, damages, costs, losses, debts, levies, taxes, duties and expenses of any and every nature whatsoever, whether at law or in equity, including civil or administrative monetary claims for damages or penalties (regardless of their origin, nature, character or basis) asserted or claimed, known or unknown, whether in tort or contract or otherwise, whether based on negligence or arising under the laws of any jurisdiction as claims, counter-claims, third party claims or otherwise, in any central, state or local courts, administrative agency proceedings or other forum ("Claims").

Provided that nothing contained herein shall be or be deemed to be a Release by TransAsia Infrastructure Holdings LLC or Pacific Alliance International LLC or their respective shareholders of Claims that may relate to or arise as a result of events occurring on or after the Effective Date (as defined in the Shareholders Agreement entered into by and amongst Pacific Alliance International LLC, TransAsia Infrastructure Holding LLC and Pacific Alliance-Stradec Group Infrastructure Company LLC).

19

000 27

This letter is not an admission of any liability and this letter shall not be treated as an admission of liability.

Sincerely,
Parsons Brinckerhoff Infrastructure Development Company, Inc.

_____

Authorized Signatory

ANNEXURE B(ii)
(Format of Undertaking)

*[To be issued on the letterhead of Parsons Brinckerhoff Infrastructure Development Company, Inc.]*

Date: December 21, 2007:

Dr. Ravindra Verma
Vice Chairman and Managing Director
TransAsia Infrastructure Holding LLC
2. Almeria,
Irvene, CA 92614, USA

Dear Dr. Verma,

Sub: Membership of TransAsia Infrastructure Holding LLC

Parsons Brinckerhoff Infrastructure Development Company, Inc., as a wholly owned subsidiary of Parsons Brinckerhoff Inc., hereby undertakes to maintain Unit ownership in TransAsia Infrastructure Holding LLC for the remainder term of the Concession Period (as defined in the Concession Agreement), in compliance with the Concession Agreement, dated as of September 2, 2002, between National Highways Authority of India and Second Vivekananda Bridge Tollway Company Private Limited.

Thanking you,

Yours faithfully,

For Parsons Brinckerhoff Development Company, Inc.

Stephen Losi
Senior Vice President

000 23

Annexure C

(Format of the Termination Agreement)

23

Dated

# TERMINATION AND RELEASE AGREEMENT

## AMONG

## PARSONS BRINCKERHOFF INFRASTRUCTURE DEVELOPMENT COMPANY INC.
(as "PBIDC")

## AND

## CONSULTING ENGINEERING SERVICES (INDIA) PRIVATE LIMITED
(as "CES")

## AND

## CARTER-BURGESS PHILS. INC.
(as "Carter Burgess")

## AND

## TRANSASIA INFRASTRUCTURE HOLDING LLC
(as "TRANSASIA")

1

A

000 31

## TERMINATION AND RELEASE AGREEMENT

THIS TERMINATION AND RELEASE AGREEMENT (this "Agreement") dated this day of _____ among:

1.    PARSONS    BRINCKERHOFF    INFRASTRUCTURE    DEVELOPMENT COMPANY INC., a company incorporated under the laws of the State of Delaware, USA, and having its principal office at One Penn Plaza, New York, NY 10119, USA (hereinafter referred to as "PBIDC");

2.    CONSULTING ENGINEERING SERVICES (INDIA) PRIVATE LIMITED, a company incorporated under the Laws of India, and having its branch office at 57, Nehru Place, 5th Floor, New Delhi - 110 019 (hereinafter referred to as "CES");

3.    CARTER BURGESS PHILS INC. a Company incorporated under the laws of Republic of Philippines and having its office at 41 Arguilla St., San Lorenzo Village, Makati City 1200, Philippines (hereinafter referred to as "Carter Burgess");

4.    TRANSASIA INFRASTRUCTURE HOLDING LLC, a Nevada corporation, USA, having its principal office at 2 Almeria, Irvine CA 92614, USA, (hereinafter referred to as "TransAsia").

(PBIDC, CES, Carter Burgess and TransAsia are collectively referred to as the "Parties" and individually as a "Party". In each case a reference to a Party shall, unless otherwise stated in this Agreement include its affiliates, successors, permitted transferees and assigns).

WHEREAS:

(A)    PBIDC, CES, Carter Burgess and TransAsia had entered into a shareholders agreement on March 31, 2004 (the "Shareholders Agreement").

(B)    The Parties have in good faith agreed, to terminate the Shareholders Agreement and release any claims that the Parties may have thereunder in the manner more fully set forth below.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and agreements contained herein, the Parties agree as follows:

1.    DEFINITIONS AND INTERPRETATIONS

    1.1    DEFINITIONS

        Capitalised terms used in this Agreement shall have the following meanings:

        "Applicable Law" shall mean any statute, law, regulation, ordinance, rule, judgement, order, decree, by-law, clearance, directive, guideline, policy, requirement, or any governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration having the

Exhibit A      000 32

force of law of any of the foregoing, by any Governmental Authority having jurisdiction over the matter in question, whether in effect as of the date of this Agreement or thereafter;

"Claim(s)" shall mean any and all claims, liabilities, obligations, demands, sums of money, costs, actions and causes of action, rights, damages, losses, debts, levies, taxes, duties and expenses of any and every nature whatsoever, arising from the Shareholders Agreement, whether at law or in equity, including any claims for damages or penalties (regardless of their origin, nature, character or basis), asserted or claimed, known or unknown, present or future, whether in tort, contract or otherwise;

"Effective Date" shall mean ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

"Governmental Authority" shall mean any international, supranational, national, provincial, regional, federal, state, municipal or local government, any instrumentality, subdivision, court, administrative or regulatory agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority;

1.2   INTERPRETATION

(a)   Heading and bold typeface are only for convenience and shall be ignored for the purpose of interpretation.

(b)   Unless the context of this Agreement otherwise requires:

(i)   words using the singular or plural number also include the plural or singular number, respectively;

(ii)   words of any gender are deemed to include all genders;

(iii)   the terms "hereof", "herein", "hereby", "hereto" and derivative or similar words refer to this entire Agreement or specified Clauses of this Agreement, as the case may be;

(iv)   the term "Clause" refers to the specified Clause of this Agreement;

(v)   reference to any legislation or Applicable Law or to any provision thereof shall include references to any such Applicable Law as it may, after the date hereof, from time to time, be amended, supplemented or re-enacted, and any reference to statutory provision shall include any subordinate legislation made from time to time under that provision; and

(vi)   reference to the word "include" shall be construed without limitation;

Exhibit A

UUU 33

2.   TERMINATION

(i)   Parties agree and confirm that the Shareholders Agreement shall stand terminated with effect from the Effective Date without any further rights, liabilities or obligations to any Party under the same.

(ii)   From the Effective Date, each of the Parties irrevocably and unconditionally, releases, waives, relinquishes, undertakes not to initiate, proceed with or prosecute and forever discharges the other Parties from all Claims that have arisen or may arise under the Shareholders Agreement.

(iii)   It is expressly agreed by the Parties that notwithstanding anything to the contrary contained in the Shareholders Agreement, none of the clauses of the Shareholders Agreement except for Clause 17 (*Confidentiality*) shall survive the termination thereof.

3.   NO ADMISSION OF LIABILITY

It is expressly understood and agreed that the transactions contemplated hereby are being arrived at on commercial terms and are aimed at a commercial settlement in the manner contemplated hereby. Neither Party is admitting to liability by entering into this Agreement or complying with any of the terms set forth herein. This Agreement, or the fact of the existence of this Agreement or any negotiations or proceedings hereof shall not be relied upon or used (except as required by law) in any proceeding between the Parties, except one to enforce this Agreement, nor shall they be deemed to constitute in any proceeding any evidence or admission of liability or wrongdoing on the part of any of the Parties, which is expressly and unequivocally denied.

4.   REPRESENTATIONS AND WARRANTIES

(a)   Each Party represents and warrants to each other Party:

(i)   such Party has all requisite power and authority and has taken all actions necessary to execute, deliver, and perform its obligations under this Agreement;

(ii)   the execution and delivery by such Party of this Agreement, the consummation of the transactions contemplated hereby, and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate actions on the part of such Party including all approvals as may be necessary by directors, members, or shareholders, as appropriate;

(iii)   this Agreement has been duly executed and delivered by each such Party, and such Party intended to make its own obligations hereunder fully effective;

000 34

(iv)    this Agreement constitutes the legal, valid, and binding obligation of each such Party, enforceable against such Party in accordance with its terms; and

(v)    the execution, delivery, and performance of this Agreement by such Party, and the consummation by such Party of the transactions contemplated hereby, will not constitute or result in a breach or violation of, or a default under, the constitutional documents of such Party or any applicable laws or regulations or any contractual obligation of such party.

## 5.    GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the United States of America.

## 6.    COUNTERPARTS

This Agreement may be executed simultaneously in any number of counterparts; each of which will be deemed an original, but all of which will constitute one and the same instrument.

## 7.    ASSURANCES

Each of the Parties hereto shall co-operate with the others and execute and deliver to the other, such instruments and documents and take such other actions as may be reasonably requested from time to time in order to carry out, give effect to and confirm their rights and intended purpose of this Agreement.

## 8.    NOTICES

Any notice required or permitted to be given hereunder shall be in writing and sent by registered mail, postage prepaid, by facsimile or telex and shall be addressed to the nominated official of the Parties at the addresses set out hereinafter or such other addresses as any of the Parties may from time to time designate by notice in writing to the other Parties.

To TransAsia:

Dr. Ravindra Verma
Managing Director & CEO
TransAsia Infrastructure Holding LLC
2 Almeria Irvine,
CA 92614, USA
Tele: (949) 252-0892
Fax: (949)553-1238

To PBIDC:

Mr. Steve Losi
Senior Vice President
Parsons Brinckerhoff Infrastructure Development Company Inc.
One Penn Plaza, New York
NY 10119, USA
Tel: (212) 465-5035

To CES:

Mr. S S Chakraborty
Managing Director
Consulting Engineering Services (India) Private Limited
57, Nehru Place
5th Floor
New Delhi-110 019
Tel: (91)-11-2646-5484
Fax: (91)-11-2646-0409

To Carter Burgess:

Wilhardo H Morales, Jr.
President and CEO
Carter Burgess Phils Inc
41, Arguilla Street, San Lorenzo Village
Makati City 1200, Philippines
Tel: +63-2-893-0437
Fax: +63-2-840-2382

Notice as provided herein shall be deemed to be served on the expiry of 5 (Five) days
from the date of its being mailed or on the date it is sent by facsimile or telex provided
such facsimile or telex is sent during normal business hours of the addressee, failing
which, it shall be deemed to be received on the immediately following day.

Annexure D

(Format of the termination agreement for termination the operating Agreement
of TransAsia)

Exhibit A

24

กบบ 38

DECLARATION OF DR. JAY VED IN OPPOSITION TO MOTIONS TO COMPEL

ARBITRATION FILED BY DEFENDANTS TRANSASIA, TRANSTECH AND DR. VERMA

EXHIBIT B

| | |
|---|---|
| **From:** | Ravindra Verma [ravi.transtech@gmail.com] |
| **Sent:** | Wednesday, January 02, 2008 5:22 PM |
| **To:** | Jay Ved |
| **Cc:** | Ken Blaisdell |
| **Subject:** | Re: CCG purchasing PBIDCnshare in TransAsia LLC |
| **Attachments:** | PBIDC-CCG SPA-Dec24-07.doc |

Jay --

I have given this further thought - there is NO way CCG can issue any payments to TransAsia.
Hence, CCG will pay the full amount to CCG, while we have some language towards the PDC amount
due to PBIDC. Attached is the final draft of the SPA between PBIDC-CCG where TransAsia simply co-
signs the SPA to ensure that the transaction goes through.

Regards,

Ravi


On 1/2/08, Jay Ved <jayved@msn.com> wrote:

Hi Ken,

As we discussed, one of the last steps in the escrow mechanism is for CCG to purchase PBIDC (PB)
share (33.33%) in TransAsia LLC. This is proposed to be completed as follows:

- CCG will pay the entire amount of purchase price to PB;
- however since TransAsia owes 1.3 m to PB for its original work, 1.3 m will be <u>paid to PB on behalf of TransAsia</u> and the remainder will be then paid as the upside to PB.
- In TransAsia books, the invoice from PB is 1.6 m, but payable by TransAsia to PB is 1.3 m; this means that TransAsia will write-off 0.3 m, with PB's consent.

I am attaching here the TransAsia 2006 tax return and the draft of the agreement for CCG purchase of
PB's share in TransAsia.

Please let us know your comments on the overall proposed structure and on tax issues if any.

Thanks and regards,

Jay

Exhibit _B_

000 39

DECLARATION OF DR. JAY VED IN OPPOSITION TO MOTIONS TO COMPEL

ARBITRATION FILED BY DEFENDANTS TRANSASIA, TRANSTECH AND DR. VERMA

# EXHIBIT C

| From: | Ravindra Verma [ravi.transtech@gmail.com] |
| --- | --- |
| Sent: | Monday, August 11, 2008 10:13 PM |
| To: | Jay Ved |
| Cc: | S S Chakraborty |
| Subject: | TransAsia -- Invoice from CCG |

Jay -

We refer to the Form W-8BEN submitted to TransAsia by CCG.
In continuation of the same, please provide us with the following:

1. Invoice from CCG to TransAsia LLC for US $1,300,000, with specific reference to the TransAsia LLC - PBIDC Inc. Agreement dated Nov. 3, 2003, supported by PBIDC Invoices to TransAsia LLC dated August 28, 2002, and November 7, 2003.
2. Your Invoice should also refer to the Jan 2008 Share Sale Agreement between PBIDC Inc. and CCG - the same was duly endorsed by TransAsia LLC as a witness. This reference shall serve as a basis for TransAsia to release the US$1.3 mil to CCG instead of the earlier liability against PBIDC.

The balance US$700,000 due, which will total up to the US $2,000,000 distribution, shall be finalized later this week, once we have a clear n final position on the tax matter based on E&Y input.

Regards,
Ravi



Exhibit C

000 40